UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

OPS America, Inc.,

      Plaintiff,

v.                                                    Civil No. 11-567 (JNE/TNL)
                                                  ORDER

Safariland, LLC, 911EP, Inc., and
Emergency Technology, Inc., d/b/a/
SoundOff Signal,

      Defendants.

      Plaintiff OPS America, Inc. ("OPS") brought this suit against Defendants Safariland, LLC and its subsidiary, 911EP, Inc. (collectively "Safariland") and Emergency Technology, Inc., d/b/a/ SoundOff Signal ("SoundOff"), alleging breach of contract, unjust enrichment, and account stated. In its Answer, SoundOff asserted breach of contract and unjust enrichment counterclaims against OPS. Now before the Court are Safariland and SoundOff's motions for summary judgment and OPS's cross-motion for summary judgment.

## I.    BACKGROUND

      Safariland manufactures law enforcement and security products. 911EP, Inc. ("911EP") was a wholly owned subsidiary of Safariland until September 26, 2009, when it was merged into Safariland. 911EP sold emergency warning lights used on police cars and ambulances. On July 29, 2009, before the merger, 911EP licensed its trademarks and sold certain assets, including specified inventory, to SoundOff. From 2006 until July 2009, Safariland purchased finished products for 911EP's product line from OPS, a contract manufacturer.[1] OPS subcontracted with

---

[1] On occasion, Safariland also purchased component parts from OPS, as needed to perform in-house warranty repairs. These parts are not the parts at issue in this litigation.

1

Ansen, a non-party manufacturing company located in China, for the manufacture of 911EP's products.

In order to fill Safariland's purchase orders, Ansen sometimes ordered component parts in bulk from its suppliers. This was done to reduce the costs of the finished products, as well as because of "minimum order quantity," or "MOQ," requirements.[2] This practice resulted in unused component inventory after the completion of each purchase order. During the time that there was an ongoing relationship between OPS and Safariland, these unused components would be consumed by future purchase orders—Safariland was never charged for excess inventory resulting from Ansen's ordering system.

In early 2009, Safariland decided to exit the 911EP business—either by selling 911EP's assets or winding up the business. Safariland and SoundOff entered into negotiations for the sale of 911EP's assets and licensing of trademarks ("911EP Asset Sale"). By May 2009, however, 911EP allegedly had approximately $1.4 million in outstanding purchase orders with OPS. SoundOff refused to take over these open purchase orders. It is undisputed that all parties understood that SoundOff would not go through with the 911EP Asset Sale unless it could start with a "clean slate." On June 2, 2009, OPS sent Safariland an invoice for $1,091,031.48, representing all component parts purchased for open 911EP orders.[3] Safariland did not pay that invoice. Instead, Safariland and OPS entered into an agreement under which OPS agreed to accept two new purchase orders, totaling $921,545.34 (the "Wrap Up Purchase Orders"). These

---

[2]    According to OPS, some component parts had to be ordered in bulk, and thus were purchased according to the MOQ requirements.

[3]    The roughly $300,000 difference between the June 2, 2009 invoice and the $1.4 million is allegedly the estimated labor costs required for assembly of the component parts into finished products. Cook Dep. 97:22-28.

orders satisfied Safariland's outstanding purchase orders for finished products.[4] In July 2009, Safariland placed the two purchase orders and OPS received the payment and shipped products to Safariland.

On July 29, 2009, Safariland and SoundOff entered into a Bill of Sale, Assignment and Assumption Agreement ("Sale Agreement"), under which SoundOff would license the 911EP intellectual property, buy 911EP's current inventory and other fixed assets through a bill of sale, and provide service and warranty repairs for 911EP finished products that shipped prior to the finalization of the agreement. The Sale Agreement transferred "free and clear of all liens, encumbrances and security interests . . . all inventories of raw materials, work in process, finished goods, supplies and shipping and packing materials set forth on Schedules B.1 and B.2." Schedules B.1 and B.2 contained itemized lists of inventories of materials. The Sale Agreement also provided that SoundOff would assume Safariland's "liabilities and obligations in connection with the Transferred Assets from and after [July 29, 2009]."

On August 14, 2009, SoundOff sent OPS a letter stating that SoundOff had assumed the "responsibility for the manufacture, sales, marketing, and distribution of the 911EP product line" and would be "evaluating the current inventories and issuing purchase orders to support the current and anticipated sales of the 911EP products." On November 5, 2009, Safariland informed Ansen that SoundOff was the "legal owner" of "all 911EP inventories held at Ansen's facilities" and had the "full authority to direct the transfer, modification or disposition of the items."

OPS and SoundOff entered into a Supply Contract with an effective date of October 16, 2009. Under this agreement, OPS was appointed SoundOff's non-exclusive supplier. The

---

[4] The parties dispute whether the Wrap Up Purchase Orders also satisfied other outstanding obligations, if any, that Safariland may have had to OPS.

Supply Contract provided an ordering procedure under which SoundOff was required to place purchase orders according to a "rolling schedule," which included forecasts of estimated purchase volumes so that OPS could "manage the components supply according to the lead-times and MOQs." Section 6.2.1. of the Supply Contract provided:

> [OPS] is authorized to purchase on behalf of [Soundoff], components and materials according to the lead-time and MOQ as justified by regular order pattern/forecasted purchases from the "rolling Schedule" and/or accepted purchase orders. [SoundOff] acknowledges that this may result in occasional "excess stock" which is not covered by open purchase orders. [OPS] will make every effort to minimize the potential for any excess inventory. [SoundOff] agrees to accept responsibility for payment of any materials deemed as excess, which were justifiably purchased on [SoundOff]'s behalf due to lead-time or MOQ requirements. [OPS] retains the right to invoice and collect payment for excess stock which has been idle for at least 6 months. Prior to invoicing [OPS] will make every reasonable effort to return any excess stock to it's [sic] supplier prior to making any such claim.

Between late 2009 and early 2010, SoundOff purchased products from OPS for the 911EP product line. Beginning in October 2009, SoundOff began experiencing problems with inventory shortages and notified OPS that OPS was not timely fulfilling SoundOff's purchase orders. SoundOff again raised concerns in December 2009 regarding OPS's failure to fulfill orders on time and possible product shortages. It is undisputed that for approximately three months after executing the Supply Contract, SoundOff placed orders according to the ordering procedure detailed in the contract. Around January 2010, however, SoundOff began to place discrete purchase order, paying up-charges for such orders, but did not supply a "rolling schedule" or any "outlook" of future orders. After that, the relationship between SoundOff and OPS broke down. On April 7, 2010, OPS provided SoundOff with a list of the component inventory at Ansen in China. OPS notified SoundOff on May 21, 2010 that SoundOff would need to be invoiced for the "idle" inventory because SoundOff had no outlook, forecast, or open

4

orders. On July 14, 2010, OPS sent SoundOff an invoice for $351,202.48 related to materials at Ansen's warehouse.[5] Around August 2010, OPS stopped accepting SoundOff's purchase orders and demanded that SoundOff pay for the "idle" or "excess" component inventory. In October 2010, OPS stated that although it had received a purchase order from SoundOff, it would not process that order until Ansen could work out the "excess component inventory" issue it had with Safariland.

OPS filed this action in state court on January 31, 2011, alleging claims of breach of contract, unjust enrichment, and account stated against Safariland and SoundOff. The case was timely removed to federal court. SoundOff filed its Answer, alleging counterclaims against OPS of breach of contract and unjust enrichment. The pretrial scheduling order required that all dispositive motions be filed by November 30, 2011. The parties stipulated to an extension of time, which the Court granted, extending the deadline for filing dispositive motions to December 31, 2011. SoundOff filed its motion for summary judgment on November 30, 2011, and Safariland filed its motion for summary judgment on December 30, 2011. OPS, however, failed to file its motion for summary judgment until February 2, 2012. Both Defendants moved to strike OPS's untimely motion. On February 21, 2012, the Court denied the Defendants' motion to strike and denied OPS's motion to amend the pretrial scheduling order. The Court agreed, however, to hear OPS's untimely motion on March 15, 2012—the hearing date for the two Defendants' timely motions for summary judgment.

---

[5]   It is undisputed that OPS did not invoice Safariland for these components, nor did OPS inform Safariland of the amount of excess inventory remaining at Ansen. Approximately $177,000 was related to parts Ansen had received prior to October 16, 2009; roughly $174,000 was related to parts Ansen received on or after October 16, 2009.

## II.   DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

OPS asserts that SoundOff is liable for the full $351,202.48 worth of excess component inventory remaining at Ansen, and that, alternatively, Safariland is responsible for the portion of the inventory Ansen received prior to the 911EP Asset Sale. Both Safariland and SoundOff contend that they are not responsible for *any* part of the component inventory. The Court will first address Safariland and SoundOff's motions for summary judgment, based on the timely submissions filed with respect to each individual motion. The Court will then address OPS's untimely motion—filed more than one month after the extended deadline for filing dispositive motions, and filed late without prior leave of the Court.

### A.  Safariland's Motion for Summary Judgment

OPS asserts that Safariland is contractually liable for the excess component parts that Ansen received prior to the 911EP Asset Sale. The Court begins by examining OPS's Complaint, which contains no allegation that Safariland is obligated to pay for excess component

parts that were not part of Safariland's purchase orders for manufactured goods. The Complaint states that "Safariland ordered goods and services from Plaintiff. During all times relevant herein, it was explicitly understood and agreed, orally and in writing, that Safariland would pay Plaintiff for each of the orders." Compl. ¶ 12. It is undisputed that Safariland *did* order goods from OPS (i.e., finished or manufactured products), and that Safariland paid OPS for each of these orders. There is no allegation within the Complaint that Safariland agreed to pay OPS for the excess components remaining *after* the completion of each of the orders. Even if the Court construed the phrase "goods and services" extremely broadly, so as to include component raw materials, summary judgment in favor of Safariland is still appropriate for a number of reasons.

First, OPS argues that Safariland should be liable for the component inventory only if OPS is unable to secure a judgment against SoundOff. This "in the alternative" argument, however, has no place in contract law—either a party is contractually liable or it is not. Safariland cannot be contractually liable only if OPS's claims against SoundOff, based on an entirely different contract, fail. Further, there is no proof that the component parts at issue were, in fact, "goods and services" OPS rendered to Safariland, as opposed to *preparation* for rendering goods and services upon request. It is undisputed that Safariland placed purchase orders for finished, manufactured goods. Ansen ordered component parts in bulk so that it could fill Safariland's purchase orders as quickly and inexpensively as possible. OPS has provided no evidence that the component parts, left over after Safariland's purchase orders were completed, were themselves "goods and services" that OPS provided.

There is also no written contract or any sort of writing memorializing Safariland's alleged agreement to pay for the excess component parts that Ansen ordered. "[A] contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless

there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought . . . ." Minn. Stat. § 336.2-201(1).[6] OPS admits that there was never a written agreement with Safariland regarding payment for excess component inventory and that "any agreement between the parties would be oral in nature." Pl.'s Mem. Opp. Safariland's Mot. Summ. J. 3. Even if the Court considered OPS's untimely argument that the alleged unwritten contract would be enforceable because the goods were "specially manufactured" under Minnesota Statute § 336.2-201(3)(a), OPS's argument still fails. There is no evidence that the excess component inventory was "manufactured" at all. In fact, there is evidence to the contrary—that the parts at issue are merely component-level parts, purchased by Ansen in their present state, and not specially manufactured for Safariland at all. Thus, even if there was an agreement regarding payment for excess component inventory, it fails to satisfy the Statute of Frauds and would be unenforceable.

OPS, however, fails to provide evidence that there ever was an agreement, oral or otherwise, between Safariland and OPS regarding payment for the excess component inventory. OPS asks the Court to find such an agreement solely based upon the parties' course of dealing. It is undisputed, however, that there was no developed practice of OPS regularly invoicing Safariland for excess component inventory. In fact, OPS had never before invoiced Safariland for excess component inventory, and did not even invoice Safariland for the component parts at issue in this litigation. This issue arose only at the time of the 911EP Asset Sale—it was a one-

---

[6] The parties cite both Florida and Minnesota law. "A district court sitting in diversity must apply the conflict of law rules for the state in which it sits." *Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 687 (8th Cir. 2001). Thus, this Court applies Minnesota choice-of-law rules. Because it is undisputed that there is no conflict between the states' laws, the Court need not engage in a choice-of-law analysis. *See Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 93-94 (Minn. 2000); *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007). Accordingly, the Court applies Minnesota law.

time occurrence.[7]  Moreover, OPS's president, Dan Cook, testified numerous times that he never viewed this excess component inventory as Safariland's responsibility.  He has always asserted, and continues to assert, that the inventory is SoundOff's obligation—not Safariland's.  While Cook is not a "legal expert regarding liability," his opinions strongly weigh against any finding of a history, course of dealing, or mutual understanding by which Safariland would be obligated to pay for excess component inventory such as that involved in this case.

Finally, as will be discussed in more detail below, OPS has made no showing of damages.  It is undisputed that Ansen purchased the component parts at issue, and there is no evidence that OPS has paid, will pay, or is even obligated to pay Ansen for that inventory.  Thus, for the reasons stated above, the Court grants Safariland's Motion for Summary Judgment with respect to all of OPS's claims against Safariland.[8]

---

[7]   OPS submitted invoices along with its untimely motion for summary judgment, which purport to be previous invoices for excess component inventory.  Even if the Court considered these later-submitted invoices, Safariland explains that the invoices relate to component parts rendered unusable due to some error on the part of Safariland—not parts merely left over due to Ansen's bulk ordering process.  OPS offers no evidence to rebut Safariland's argument.  The Court also refuses to give weight to the declaration of OPS's president, Dan Cook, which OPS submitted along with its motion.  In that declaration, Cook asserted that "[w]hen the excess component inventory had become idle for multiple months, OPS invoiced Safariland for the inventory." Cook Decl. ¶ 13.  Cook had earlier testified during his deposition, however, that OPS did not invoice Safariland for the leftover component inventory and had no history or practice of invoicing Safariland for such inventory.  Cook Dep. 170:4-7, 232:10-24.  OPS cannot create a material disputed fact by contradicting Cook's deposition with his later declaration.  *See Lykken v. Brady*, 622 F.3d 925, 933 (8th Cir. 2010) (explaining that an affidavit that contradicts deposition testimony should be ignored unless it "merely explains aspects of the prior testimony, or when the deposition resulted from confusion on the deponent's part requiring explanation").  Here, Cook's declaration "does not attempt to explain h[is] deposition testimony—it merely contradicts it." *Id.*

[8]   In its opposition memorandum, OPS failed to address Safariland's motion for summary judgment regarding OPS's unjust enrichment and account stated claims.  "[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument." *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 756 (8th Cir. 2009).  OPS did address its unjust enrichment claim in its own untimely motion for summary judgment, but pointed to nothing in

9

**B.  SoundOff's Motion for Summary Judgment on OPS's Claims**

OPS asserts that SoundOff breached the Supply Contract, and thus is liable for the entire $351,202.48 worth of component inventory.  There are a number of problems with OPS's claims.  First, the Complaint makes no reference at all to the Supply Contract between OPS and SoundOff.  The Complaint mentions only the August 14th and November 5th letters—letters that OPS now admits are of no effect, based on the integration clause contained within the Supply Contract.  The Complaint goes on to state that in "mid-2010, SoundOff ceased placing orders or providing forecasts," leaving a balance due in excess of $350,000.  Compl. ¶ 8.  Paragraph twelve of the Complaint vaguely asserts that "SoundOff expressly assumed [Safariland's obligation to pay] in a writing."  *Id.* ¶ 12.  There was nothing in the Complaint to alert SoundOff to the fact that OPS was asserting a claim based on an alleged breach of the Supply Contract.  This is in stark contrast to SoundOff's Answer and Counterclaim, which states that "SoundOff and OPS entered into a Supply Contract on or about October 16, 2009" and that OPS failed "to provide product for which it has been paid . . . in breach of the Supply Contract."  SoundOff's Answer & Countercl. ¶¶ 43, 81.  OPS could have moved to amend its Complaint, but did not do so.  It was only after discovery was closed that OPS specifically asserted that SoundOff breached the Supply Contract.

Throughout this litigation, OPS has been extremely unclear as to *how* it believes SoundOff breached the Supply Contract.  In its memorandum in opposition to SoundOff's motion for summary judgment, OPS asserted that its "breach of contract action against SoundOff Signal relates specifically to SoundOff Signal's failure to place orders or provide forecasts in

---

the record to prove what benefit, if any, Safariland obtained from these excess component parts.  There is also nothing in the record to prove how any such benefit was "unjust."  Moreover, given the lack of evidence of OPS's damages, a monetary award to OPS would itself be unjust.  The Court grants Safariland's motion on both the unjust enrichment and account stated claims.

violation of the Supply Contract's terms." Pl.'s Mem. Opp. SoundOff's Mot. Summ. J. 3. This claim is based on paragraph 6.2 of the Supply Contract, which provides that SoundOff "will place, and maintain regularly (at least monthly), a 'rolling schedule' of orders and forecasts of [SoundOff]'s estimated purchase volumes." OPS's entire five-page opposition brief discusses only this alleged failure to place orders according to the prescribed contractual ordering procedure.[9] In OPS's memorandum in support of its own motion for summary judgment, however, OPS asserts that SoundOff failed to perform under the Supply Contract in *two* ways— by failing to place orders under paragraph 6.2 *and* by failing to pay for excess component inventory under paragraph 6.2.1. OPS's memorandum in opposition to SoundOff's motion for summary judgment completely neglects to mention this latter alleged breach, and the Court would be within its discretion to disregard this untimely argument, especially given OPS's utter failure to mention the Supply Contract at all in its Complaint. But even considering both of OPS's theories as to SoundOff's alleged breach of contract, OPS's claim still fails.

"To establish a breach-of-contract claim, a plaintiff must show that (1) a contract was formed; (2) the plaintiff performed any conditions precedent; and (3) the defendant breached the contract." *Commercial Assoc., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006). "Liability for breach of contract requires proof that damages resulted from or were caused by the breach." *Border State Bank of Greenbush v. Bagley Livestock Exch., Inc.*, 690 N.W.2d 326, 336 (Minn. Ct. App. 2004); *see also Lipka v. Minn. Sch. Emps. Ass'n, Local 1980*, 537 N.W.22d 624, 631 (Minn. Ct. App. 1995) ("A plaintiff, however, is barred from recovering

---

[9] Notably, OPS does not articulate how this alleged failure to place a "rolling schedule" of orders resulted in the excess component inventory at issue. There is no evidence connecting the specific component inventory to SoundOff's alleged failure to properly place orders. The Court can only speculate as to how such a breach could have resulted in OPS's claimed damages— more is needed to survive a motion for summary judgment.

under a contract theory absent an injury from the claimed breach."); *Enduracon Techs., Inc. v. Northshore Mining Co.*, No. A09-2332, 2010 WL 3854336, at *7 (Minn. Ct. App. Oct. 5, 2010) ("To prevail on a breach-of-contract claim, the plaintiff must prove damages.").

OPS has provided no evidence that any damages resulted from SoundOff's alleged breach. It is undisputed that Ansen—*not* OPS—purchased the component inventory at issue in this case. It is also undisputed that OPS has not paid Ansen for this inventory. Cook testified that Ansen has demanded payment from OPS, but there is nothing in the record indicating that OPS has paid, will pay, or is even obligated to pay Ansen for the component inventory. The mere fact that Ansen asked OPS to pay does not provide evidence of OPS's damages. OPS points to nothing in the record indicating that it is obligated to pay Ansen for the component inventory. For example, OPS offers no testimony or affidavits indicating that OPS is liable to Ansen for the inventory, nor does OPS provide the Court with evidence of a contract or agreement between OPS and Ansen under which OPS is obligated to reimburse Ansen for any inventory purchases. Ansen has not sued OPS to recover for the component inventory, nor is there an indication that Ansen will sue OPS in the future. OPS has not provided the Court with any invoice from Ansen, requesting payment from OPS. There is no evidence that the business relationship between OPS and Ansen has been or will be damaged by nonpayment for the component inventory. OPS has suffered no out-of-pocket loss related to the component inventory at issue, and OPS points to no evidence that it will ever suffer any loss in the future. "[D]amages for breach of contract must be proved to a reasonable certainty, and a party cannot recover speculative, remote, or conjectural damages." *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004) (internal quotation marks omitted). "[O]nce the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as

there is proof of a reasonable basis upon which to approximate the amount." *Id.* (internal quotation marks omitted). Here, OPS has failed to provide any evidence of the "fact of loss." OPS is essentially here in proxy for Ansen, the only entity that has suffered any demonstrable injury related to nonpayment for the component inventory.

OPS relies heavily on paragraph 6.2.1 of the Supply Contract, which permits OPS to purchase components and materials, and provides that SoundOff will pay for excess materials "which were justifiably purchased on [SoundOff's] behalf due to lead-time or MOQ requirements." As noted above, however, there is no evidence that the component inventory was purchased by OPS—in fact, the undisputed evidence is that *Ansen* purchased the inventory. There is no allegation in the Complaint that OPS purchased the inventory, nor was any such proof adduced in discovery. Purchases by Ansen are not encompassed by the Supply Contract. Although the Supply Contract permits OPS "to invoice and collect payment for excess stock which has been idle for at least 6 months," it also provides that "[p]rior to invoicing [OPS] will make every reasonable effort to return any excess stock to it's [sic] supplier prior to making any such claim." Thus, under the terms of the Supply Contract, OPS cannot invoice or make a claim for excess stock that has been returned to its suppliers. Ansen is one of OPS's suppliers. It is undisputed that here, the excess component inventory was purchased by Ansen and is located at Ansen's facilities in China—it is not and has never been in OPS's legal or physical possession. It does not even need to be "return[ed]" to OPS's supplier because it never *left* the supplier. Thus, paragraph 6.2.1 provides no authority for OPS to invoice SoundOff for excess stock that OPS's supplier, rather than OPS, paid for and possesses.

Moreover, by the fact that OPS refuses to advance any theory of liability that does not include the full $351,202.48, it is clear that OPS's claim cannot be based on the Supply Contract.

The Supply Contract only pertains to materials purchased on SoundOff's behalf, and only takes effect on October 16, 2009. The Supply Contract cannot provide any basis for finding SoundOff liable for the component inventory purchased prior to October 16, 2009, and it especially provides no basis for finding SoundOff liable for the inventory purchased on *Safariland's* behalf prior to the 911EP Asset Sale in July 2009. There is no evidence indicating that SoundOff is liable for the inventory purchased on Safariland's behalf. Neither the Bill of Sale, which itemized the inventory Safariland transferred to SoundOff, nor the Supply Contract, indicate that the component parts at issue were transferred to SoundOff. The contracting parties to the 911EP Asset Sale—Safariland and SoundOff—both agreed that the component inventory at issue was not part of the sale and was not transferred.[10]

OPS seems to assert that because SoundOff ultimately took over the manufacture, sales, marketing, and distribution of the 911EP product line, all inventory, even that purchased for Safariland prior to the 911EP Asset Sale, was ultimately purchased on SoundOff's behalf. But it is the plaintiff's responsibility to show what evidence it has to support its claim that, in this case, items sitting on a shelf in China were purchased on behalf of SoundOff. Even with respect to the inventory purchased after the 911EP Asset Sale, and after the execution of the Supply Contract, OPS has not done this. OPS provides only a list of component parts, with no explanation as to what they are, for whom they were purchased, or even why Ansen purchased them. OPS has not provided any evidence that these specific parts were purchased for SoundOff, or on SoundOff's

---

[10]   OPS's interpretations of the words "inventory" and "raw materials" are irrelevant, since if there was any ambiguity in the Sale Agreement, the Court would look to the intent of the *contracting parties*. Here, there is no ambiguity as to which assets were transferred, since the Sale Agreement included a Bill of Sale that itemized the transferred assets. Moreover, the contracting parties mutually agreed to only transfer the listed inventory, and there is no dispute between those parties that Safariland did not transfer to SoundOff the component inventory at issue.

behalf, or that they were "justifiably purchased . . . due to lead-time or MOQ requirements." Without any evidence to support its assertions, OPS's breach of contract claim against SoundOff must fail.[11]

**C. SoundOff's Motion for Summary Judgment on SoundOff's Counterclaims**

SoundOff asserts eight counterclaims against OPS. The first seven counts are breach of contract claims: Counts I through V relate to alleged breaches of specific purchase orders; Count VI relates to OPS's alleged failure to return tooling after the termination of the Supply Contract; and Count VII relates to OPS's alleged failure to acknowledge SoundOff's purchase orders. Count VIII is a claim for unjust enrichment relating to OPS's alleged unjust retention of SoundOff's money and tooling.[12]

First, the Court notes that in SoundOff's motion for summary judgment, SoundOff does not discuss its unjust enrichment counterclaim and makes no mention of OPS's alleged failure to return tooling. Thus, the Court cannot grant summary judgment in favor of SoundOff on these claims. With respect to its breach of contract counterclaims, SoundOff asserts that OPS became the first breaching party when it failed to fulfill five discrete purchase orders. SoundOff later acknowledged, however, that OPS has made some payments toward curing those defects, but that there remains an outstanding balance of $11,065.00 on purchase order #35428. The Court

---

[11] As with Safariland's motion for summary judgment regarding OPS's unjust enrichment and account stated claims, OPS likewise fails to address these claims in its opposition to SoundOff's motion for summary judgment. These claims have therefore been waived. *See Satcher*, 558 F.3d at 756. In its own motion for summary judgment, OPS argues that SoundOff received four benefits from the excess component inventory, but cites to nothing in the record to support these assertions. There is also no evidence that any such benefits would have been "unjust." The Court therefore grants SoundOff's motion on the unjust enrichment and account stated claims.

[12] During oral argument, SoundOff alluded to a counterclaim seeking recovery for the destruction of the 911EP business—but the Court cannot find a reference to such a claim in SoundOff's Answer and Counterclaim.

cannot tell whether SoundOff is now only moving for summary judgment on the count(s) related to purchase order #35428, or whether SoundOff is continuing to assert other counterclaims as well. The Court will not grant summary judgment in favor of SoundOff when it is unclear which claims SoundOff is pursuing.

OPS's motion for summary judgment on SoundOff's counterclaims is even less enlightening. OPS states that it moves for summary judgment "on SoundOff's counterclaims," but only addresses, in very general terms, breach of contract claims. OPS mentions no particular counts or claims, and does not even point to any specific purchase orders. In fact, the portion of OPS's brief dealing with SoundOff's counterclaims contains not a single citation to the record. Thus, while both parties argue that the other breached the Supply Contract first, without more, the Court cannot discern when each alleged breach occurred, which breach occurred first, or whether any of the alleged breaches were material enough to justify the other party's nonperformance. Moreover, Cook testified that he believed OPS had fully reimbursed SoundOff. This is a fact dispute and not appropriate for summary judgment.

Because neither OPS nor SoundOff have adequately briefed their motions for summary judgment on SoundOff's counterclaims, and the Court cannot even determine which counts the parties have moved on or continue to pursue, the Court denies both motions.

### D. OPS's Motion for Summary Judgment

The Court, having addressed all of OPS's claims against both Safariland and SoundOff, finds no issues remaining to be addressed. OPS's motion for summary judgment is denied.

### III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

16

1. Safariland's Motion for Summary Judgment [Docket No. 42] is GRANTED.

2. SoundOff's Motion for Summary Judgment [Docket No. 31] is GRANTED IN PART and DENIED IN PART.

3. Summary judgment is GRANTED in favor of SoundOff on OPS's claims against SoundOff.  Summary judgment is DENIED on SoundOff's counterclaims against OPS.

4. OPS's Motion for Summary Judgment [Docket No. 52] is DENIED.

Dated: March 21, 2012

                                              s/ Joan N. Ericksen
                                              JOAN N. ERICKSEN
                                              United States District Judge